UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 04-4081(DSD/SRN)

Medmarc Casualty Insurance
Company,

       Plaintiff,

v.                                                          **ORDER**

Angeion Corporation, ELA Medical,
Inc., and ELA Medical, S.A.,

       Defendants.

Jarvis C. Jones, Esq., Britton D. Weimer, Esq. and Blackwell Igbanugo, 3601 78th Street West, Suite 250, Minneapolis, MN 55435, counsel for plaintiff.

Jonathan M. Bye, Esq., James W. Reuter, Esq. and Lindquist & Vennum, 4200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, counsel for Angeion.

Bruce G. Jones, Esq., Kevin P. Wagner, Esq., Diana Y. Morrissey, Esq. and Faegre & Benson, 90 South Ninth Street, Suite 2200, Minneapolis, MN 55402, counsel for ELA.

This matter is before the court upon plaintiff's motion for summary judgment and defendant Angeion Corporation's motion for partial summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court denies plaintiff's motion and grants Angeion's motion.

**BACKGROUND**

This is principally a dispute over the scope of coverage afforded by a commercial general liability ("CGL") insurance

policy. Defendant Angeion Corporation ("Angeion") manufactures medical devices. Plaintiff Medmarc Casualty Insurance Company ("Medmarc") is Angeion's liability insurer. Among other things, Angeion makes implantable cardioverter defibrillators (ICDs). An ICD is a small device which is implanted in a patient's body and connected to the heart by an electrical wire. The device monitors the heart's rhythm. If and when an irregularity develops, the ICD delivers an electrical shock to restore proper heart function. The sorts of irregularities detected and corrected by the ICD often have the potential to result in cardiac arrest and sudden death.

ICDs are battery-powered. In approximately June 2002, defendants ELA Medical, Inc., and ELA Medical, S.A., (collectively "ELA") distributors of Angeion ICDs, discovered that batteries in more than 14 units were wearing out prematurely. Angeion and ELA decided to withdraw ICDs affected by the defect from the market. With the approval of the Federal Food and Drug Administration, Angeion and ELA sent notice to physicians on June 27, 2002, encouraging them to bring in their patients for examination and possible surgical removal of defective ICDs. On July 17, 2002, Angeion notified Medmarc of the ICD defect and the actions it had taken to withdraw affected units from the market. Medmarc denied any coverage under Angeion's policy, but requested notice of any claims that might arise.

On June 18, 2003, ELA sent a letter to Angeion demanding reimbursement of costs it incurred for medical examinations and surgeries relating to the withdrawal of the defective ICDs. ELA based its demand on certain provisions of its distribution agreement with Angeion. ELA asserted that Angeion was bound by contract "to bear the reasonable costs ... of all Recalls of the [ICDs]...." Angeion provided ELA's demand letter to Medmarc on August 26, 2003. In several subsequent letters, Medmarc appeared to acknowledge that parts of ELA's claim might be covered under Angeion's policy. On September 10, 2004, however, Medmarc wrote to Angeion denying coverage. Three days later, it commenced this action against Angeion and ELA, seeking a declaration that Angeion's policy provides no coverage for the withdrawal of its ICDs or for ELA's claims. On October 19, 2004, ELA answered the complaint, counterclaimed against Medmarc and filed a cross-claim against Angeion. The cross-claim duplicates the contract claim expressed in ELA's demand letter, but adds negligence and strict liability as additional theories of recovery. Medmarc now moves for summary judgment, and Angeion cross-moves for partial summary judgment on the issue of Medmarc's duty to defend Angeion against ELA's cross-claim.

**DISCUSSION**

**I.   Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the non-moving party. See id. at 255. The non-moving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be

4

granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23. Judgment may be rendered with respect to all or any part of a particular claim. See Fed. R. Civ. P. 56(b).

## II. Duty to Defend

### A. Standards

The parties call upon the court to determine whether Medmarc has a duty under the terms of the CGL policy to defend Angeion against ELA's cross-claim. When considering whether the duty exists, the court construes the complaint against the insured liberally and compares its claims to the coverage afforded by the policy. See Home Ins. Co. v. Nat'l Union Fire Ins. of Pittsburgh, 658 N.W.2d 522, 535-36 (Minn. 2003). "A duty to defend an insured arises if any part of the claim is *arguably* within the scope of the policy's coverage, and the burden is on the insurer to prove that a claim clearly falls outside the coverage." Id. at 529 (citing Prahm v. Rupp Constr. Co., 277 N.W.2d 389, 390 (Minn. 1979)) (emphasis in original).

To interpret the policy, the court applies general contract principles and tries to give effect to the intent of the parties. See Thommes v. Milwaukee Ins. Co., 641 N.W.2d 877, 879 (Minn. 2002). If the policy language is unambiguous, the court gives it its plain and ordinary meaning. See id. at 880. If ambiguous, it is construed against the drafter. See Progressive Specialty Ins.

Co. v. Widness ex rel. Widness, 635 N.W.2d 516, 518 (Minn. 2001). Finally, "exclusions contained in an insurance policy are as much a part of the insurance contract as any other part, and must be given the same consideration in determining what the policy covers." Thommes, 641 N.W.2d at 880 (citing Lobeck v. State Farm Mut. Auto. Ins. Co., 582 N.W.2d 246, 249 (Minn. 1998)). Exclusions are construed strictly against the insurer in light of the expectations of the insured. See id. at 880.

    **B.   What Does the Policy Cover?**

The CGL policy provides that Medmarc has the duty to defend Angeion "against any 'suit' seeking ["damages because of 'bodily injury' or 'property damage' included within the 'products-completed operations hazard' to which this insurance applies"]." (Policy at 1.) The "bodily injury" or "property damage" must be "caused by an 'occurrence'", that is, it must be caused by an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at 1, 10.)

In Medmarc's standard CGL policy, "'bodily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (Id. at 9.) However, Medmarc did not issue Angeion its standard policy. In the policy it issued to Angeion, Medmarc redefined "bodily injury" to mean:

6

> bodily injury, sickness, disease, mental anguish, humiliation, embarrassment, shock, damage to professional reputation or other consequential economic loss (return of professional fees, loss of patient faith or approbation, or any costs incurred to regain customer approval) sustained by a person, including death resulting from any of these at any times.

(Endorsement 234 11 96B.)  The difference between the two definitions is striking.  As defined in the endorsement, "bodily injury" does not require any corporeal harm whatsoever.  It includes items of intangible personal suffering such as humiliation and embarrassment.  More than that, it encompasses all manner of injuries to a person's pocketbook.  It covers "damage to professional reputation or other consequential economic loss."  In this context, the plain and ordinary meaning of the phrase "consequential economic loss" extends to "all indirect loss resulting from the inability to make use of [a] defective product," excluding the value of the product itself.  63B Am. Jur. 2d Products Liability § 1911 (2005).  Thus, the policy's coverage of damages because of "bodily injury" is phenomenally broad.

The "products-completed operations hazard" of which "bodily injury" is a part was also expanded by endorsement.  In the standard policy, the hazard "[i]ncludes all 'bodily injury' and property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work'...."  (Policy at 10.)  In the endorsement, the hazard:

> included [sic] all 'bodily injury', including the cost of reasonable and necessary medical expenses incurred by person [sic] attributable to the withdrawl [sic] of 'your products' including any physical examinations and surgical expenses, and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work'....

(Endorsement 234 11 96C.)

### C. Is ELA's Claim Potentially Covered?

ELA's cross-claim alleges that, in 2002, some ICDs it had purchased from Angeion for resale manifested a defect. Specifically, the energy stored in the ICDs' batteries depleted prematurely. The depletion made it necessary for ELA to surgically withdraw the affected ICDs from the thoraces of its customers and replace them with new ones. To effect this withdrawal and replacement, ELA incurred expenses equaling $1,665,068.38 and is likely to incur more in the future. Those damages represent "medical expenses (i.e., "Hospital Costs") and other costs and expenses (i.e., "Other costs" and "Device's cost") incurred in connection with the withdrawal and replacement of the ICDs...." (Cross-cl. at 11.)

Thus stated, ELA's claim is potentially covered by the policy, and Medmarc has a duty to defend Angeion. The cross-claim is a "suit" for "damages because of bodily injury" because it seeks compensation for medical and other expenses included within the policy's coverage of consequential economic loss. The damages

8

sought are within the covered "products-completed operations hazard" because they resulted from "bodily injury" and arose out of the failure of Angeion's product. In fact, the insured hazard expressly includes reasonable and necessary medical expenses attributable to the withdrawal of Angeion's product. Finally, although the cross-claim does not spell-out the precise cause of the battery depletion, ELA characterizes it as a "failure" that was "premature" and does not allege that it was expected or intentional. Thus, ELA's "bodily injury" was caused by an "occurrence" because the battery depletion was an accident. Accordingly, all the coverage triggers are satisfied and Medmarc must defend Angeion.

### D.   Defenses to Coverage

Medmarc offers several arguments why the policy it issued Angeion does not offer coverage against ELA's claims. Medmarc first argues that "bodily injury" requires a personal, physical injury sustained by a natural person and that the requirement is a "universal and fundamental requirement in literally all CGL policies." Such a requirement is certainly intuitive. However, in the "bodily injury" endorsement, Medmarc acted as its own lexicographer and expanded "bodily injury" far beyond its meaning in common parlance. Having specially defined "bodily injury," and

having made that definition the basis of its bargain with Angeion, Medmarc cannot now assert that the phrase should hold a conventional meaning.

Second, Medmarc argues that ELA's damages did not arise out of Angeion's product but rather arose from ELA's agreement with Angeion. When used in an insurance policy, the phrase "arising out of" is to be construed broadly and includes "originating from," "growing out of" or "flowing from." See Dougherty v. State Farm Mut. Ins. Co., 699 N.W.2d 741, 744 (Minn. 2005). The phrase implies some causal connection between ELA's injury and Angeion's product. See id. at 743-44. Here, ELA's damages allegedly grew out of the defect in Angeion's product because it was the defect that necessitated the product's withdrawal from the market. Therefore, there is a sufficient causal link between Angeion's product and ELA's damages to satisfy the "arising out of" clause.

Third, Medmarc argues that no "occurrence" took place because the withdrawal of Angeion's product was "not caused by an accident, but by Angeion's and ELA's conscious and deliberate business decision to take remedial action to repair and replace Angeion's defective ICD units...."[1] Medmarc's argument ignores the

---

[1] Elsewhere, Medmarc devotes two sentences of its opening memorandum to the alternative argument that each withdrawal of a defective ICD constituted a separate "occurrence" under the policy for which the self-insured retention amount of $50,000 has not been met. The court finds no merit in the argument and, furthermore, declines to discuss it in any greater depth than Medmarc did.

allegations of ELA's cross-claim regarding the root cause of the product withdrawal. ELA and Angeion did not decide to withdraw the ICDs in a vacuum or on a whim. Rather they noted that the unexpected premature depletion of the ICD batteries would result in an "absence of therapy" that "could conceivably be life-threatening." (Cross-cl. ¶ 36.) Stated differently, they foresaw that one or more of their customers might die if the batteries in their ICDs failed to provide sufficient energy to shock their chaotically-beating hearts into life-sustaining rhythm. It was that risk of death, caused by the unanticipated battery depletion, that triggered the decision to withdraw the ICDs. (See Counter-cl. ¶¶ 37-38.) Therefore, ELA's withdrawal-related damages were allegedly "caused by an 'occurrence,'" or accident, within the meaning of the policy.

### E. Policy Exclusions

Medmarc also argues that two policy exclusions prevent coverage of ELA's cross-claim.[2] As the insurer, Medmarc bears the burden of proving the applicability of a policy exclusion. See Domtar, Inc. v. Niagara Fire Ins. Co., 563 N.W.2d 724, 736 (Minn. 1997). If it is successful, the burden shifts to Angeion to prove

---

[2] Medmarc had initially advocated the application of a third exclusion. In its reply memorandum, however, Medmarc acknowledges that the exclusion addresses only a portion of the damages that are apparently demanded in ELA's cross-claim. (Medmarc's Reply Mem. at 15-16.) Because Angeion need only show that some portion of ELA's claim is covered to establish the duty to defend, the exclusion is irrelevant.

11

that an exception to the exclusion applies. See id. at 736. Medmarc first contends that coverage is barred by the policy's "sistership" exclusion. The court need not decide whether that exclusion applies, however, because Angeion has shown that at least part of ELA's cross-claim falls within an exception to the exclusion. In an endorsement, Medmarc agreed that the policy's sistership exclusion:

> does not apply to the cost of reasonable and necessary medical expenses incurred by persons attributable to the withdrawal of [Angeion's products], including physical examinations and surgical expenses, made necessary by reason that the use or consumption of such products shall result in bodily injury, sickness, disease or death of any person....

(Endorsement 234 11 96G.)  ELA's cross-claim alleges that the defect in Angeion's ICDs created a risk of death that necessitated the withdrawal of those ICDs. At least a portion of the damages claimed by ELA are for the medical expenses it incurred in carrying out that withdrawal. To trigger the duty to defend, Angeion need only show that some part of ELA's claim is potentially covered. See Wooddale Builders, Inc. v. Maryland Cas. Co., 695 N.W.2d 399, 406 (Minn. Ct. App. 2005). Because at least part of ELA's claim is excepted from the "sistership" exclusion, Medmarc's argument fails.

Medmarc also argues that coverage of ELA's claim is barred by the policy's "contractual liability" exclusion. The "contractual liability" exclusion provides as follows:

> This insurance does not apply to ... "[b]odily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement....

(Policy at 2.)  Once again, Angeion has shown that ELA's claim falls within an exception to the exclusion.  Whatever the exclusion may mean, it "does not apply to liability for damages ... [a]ssumed in a contract or agreement that is an 'insured contract', provided the 'bodily injury' ... occurs subsequent to the execution of the contract or agreement."  (Policy at 2.)  An "insured contract" means, among other things, "[a]ny written contract or agreement relating to the conduct of [Angeion's] business of manufacturing, selling or distributing [its] products," as long as Angeion does not agree to assume liability for damages caused by a third-party's sole negligence.  (Policy at 9.)  ELA's cross-claim alleges that Angeion contractually assumed the obligation to reimburse ELA for the medical expenses it incurred in the ICD withdrawal.  (Cross-cl. ¶ 50.)  That alleged agreement was reduced to writing and has been placed in evidence.  There is no dispute that the agreement was consummated before the battery depletion occurred.[3]  Furthermore,

---

[3]  For the same reason, the court cannot sustain Medmarc's argument that Angeion breached its duty not to "voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [Medmarc's] consent" (Policy at 6) by entering into the contract with ELA.  That duty of Angeion's arises only "in the event of [an] occurrence, claim or suit" (Policy at 6), and there is no dispute that Angeion entered into its agreement with ELA prior to the battery depletion.

13

there is no allegation or evidence that the withdrawal and its related expenses were caused by ELA's or any another party's sole negligence. Therefore, the requirement of a "written" contract "relating to the conduct of [Angeion's] business" has been fulfilled, and Medmarc may not rely on the "contractual liability" exclusion. Angeion is entitled to partial summary judgment.

### F.    Deposition of Francis Stockwell

Medmarc requests that the court strike the testimony of its chief underwriting officer, Francis Stockwell, regarding the meaning of various provisions of the policy. The court finds no reason to do so. The policy provisions on which the court has relied herein are unambiguous and themselves sufficient evidence of the parties' intent. Although Mr. Stockwell's testimony has thus been unhelpful and unnecessary in the disposition of the present motions, that is not a reason to strike it from the record. Medmarc's request is denied.

### CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1.    Angeion's motion for partial summary judgment [Doc. No. 41] is granted.

2.    Medmarc's motion for summary judgment [Doc. No. 67] is denied.

3.  It is hereby ordered, adjudged and decreed that:

   a.  Medmarc has a duty to defend Angeion against ELA Medical's cross-claim.

   b.  Medmarc has breached its duty so to defend.

   c.  Medmarc has a duty to pay on a prompt and monthly basis Angeion's reasonable defense fees and costs including those incurred and those that will be incurred in the future that relate to ELA Medical's cross-claim.

Dated:  August 25, 2005

                                     s/David S. Doty
                                     David S. Doty, Judge
                                     United States District Court