UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 04-4081(DSD/JJG)


Medmarc Casualty Insurance
Company,

        Plaintiff,

v.                                 **ORDER**

Angeion Corporation, ELA Medical,
Inc., and ELA Medical, S.A.,

        Defendants.


        Jarvis C. Jones, Esq., Britton D. Weimer, Esq. and
Blackwell Igbanugo, 3601 78th Street West, Suite 250,
Minneapolis, MN 55435, counsel for plaintiff.

        Jonathan M. Bye, Esq., James W. Reuter, Esq. and
Lindquist & Vennum, 4200 IDS Center, 80 South Eighth
Street, Minneapolis, MN 55402, counsel for Angeion.

        Bruce G. Jones, Esq., Kevin P. Wagner, Esq., Diana Y.
Morrissey, Esq. and Faegre & Benson, 90 South Ninth
Street, Suite 2200, Minneapolis, MN 55402, counsel for
ELA.


        This matter is before the court upon plaintiff Medmarc
Casualty Insurance Company's ("Medmarc") motion for summary
judgment, defendant Angeion Corporation's ("Angeion") motion for
summary judgment and determination of defense fees, and defendants'
ELA Medical, Inc. and ELA Medical, S.A.S., (collectively "ELA")
motion to dismiss. Based upon a review of the file, record and

proceedings herein, and for the reasons stated, the court grants plaintiff's motion in part, grants defendant Angeion's motion in part and grants the ELA defendants' motion.

## BACKGROUND

This action arises from a dispute over the scope of coverage afforded by a commercial general liability ("CGL") insurance policy. Defendant Angeion manufactures medical devices. Plaintiff Medmarc is Angeion's liability insurer. Among other things, Angeion makes implantable cardioverter defibrillators (ICDs). An ICD is a small device that is implanted in a patient's body and connected to the heart by an electrical wire. The device monitors the heart's rhythm. If and when an irregularity develops, the ICD delivers an electrical shock to restore proper heart function. The types of irregularities detected and corrected by the ICD often have the potential to result in cardiac arrest and sudden death.

ICDs are battery-powered. In approximately June 2002, the ELA defendants, who are distributors of Angeion ICDs, discovered that batteries in more than fourteen units were wearing out prematurely. Angeion and ELA decided to withdraw ICDs affected by the defect from the market. With the approval of the Federal Food and Drug Administration, Angeion and ELA sent notice to physicians on June 27, 2002, encouraging them to bring in their patients for examination and possible surgical removal of defective ICDs. The

notice specified the voltage levels at which the ICDs should be explanted. (See Jahnke Aff. Ex. D at 2, Mar. 8, 2005.) On July 17, 2002, Angeion notified Medmarc of the ICD defect and the actions it had taken to withdraw affected units from the market. Medmarc denied any coverage under Angeion's policy, but requested notice of any claims that might arise.

On June 18, 2003, ELA sent a letter to Angeion demanding reimbursement of costs it incurred for medical examinations, surgeries and other expenses relating to the withdrawal of the defective ICDs. ELA based its demand on certain provisions of its distribution agreement with Angeion. ELA asserted that Angeion was bound by contract to pay the reasonable costs of all ICD recalls. Angeion provided ELA's demand letter to Medmarc on August 26, 2003. In several subsequent letters, Medmarc seemed to acknowledge that parts of ELA's claim might be covered under Angeion's policy. On September 10, 2004, however, Medmarc wrote to Angeion denying coverage. Three days later, it commenced this action against Angeion and ELA, seeking a declaration that Angeion's policy provides no coverage for the withdrawal of its ICDs or for ELA's claims.

Shortly thereafter, ELA informed Angeion that it wanted to pursue arbitration in New York, as set forth in the contracts between the two parties. Based on cost considerations, Angeion

asked ELA to instead file a cross-claim in this suit.[1]   As a result, Angeion and ELA agreed that (1) ELA would proceed by cross-claim, (2) they would ask for an early settlement conference with the magistrate judge and (3) arbitration would be waived if not commenced before June 30, 2005.   On October 19, 2004, ELA answered the complaint, counterclaimed against Medmarc and cross-claimed against Angeion.   The cross-claim duplicates the contract claim expressed in ELA's demand letter, but adds negligence and strict liability as additional theories of recovery.

As early as November 4, 2004, Angeion and ELA requested an early settlement discussion, but Medmarc declined.   Angeion and ELA nonetheless discussed settlement between themselves.   In early 2005, Medmarc and Angeion filed cross-motions for summary judgment on the issue of Medmarc's duty to defend Angeion against ELA's cross-claim.   The hearing on the parties' motions was originally scheduled for April 22, 2005, but upon Medmarc's request was postponed to June 24.   ELA was dissatisfied with the slow pace of the litigation and began to pressure Angeion to settle or face arbitration.   The two parties exchanged numerous settlement offers between April 15 and mid-June, 2005.   On June 24, 2005, the court heard oral arguments and took the summary judgment motions under

---

[1]   Medmarc alleges that Angeion and ELA agreed to proceed by cross-claim so that a "suit" would result and Medmarc's policy would provide coverage.   However, Medmarc fails to explain why an arbitration would not also invoke policy coverage.

advisement.  On June 29, Angeion advised Medmarc of ELA's threat to commence arbitration and that Angeion planned to settle with ELA the next day.

On June 30, Angeion and ELA executed settlement agreements. Angeion agreed to have judgment entered against it and in ELA's favor in the amount of $1.4 million, in exchange for the dismissal of ELA's cross-claim.  In satisfaction of the judgment, Angeion agreed to pay ELA $400,000 on June 30, execute a promissory note for $400,000 and assign to ELA intellectual property with a fair market value of at least $600,000.  On July 7, 2005, the Clerk of Court entered judgment against Angeion and in favor of ELA in the amount of $1.4 million.

On August 25, 2005, this court granted Angeion's motion for partial summary judgment and denied Medmarc's cross-motion, holding that Medmarc had a duty to defend Angeion against ELA's cross-claim.  The court also held that Medmarc breached that duty and must pay Angeion's reasonable defense fees and costs.  Now before the court are Angeion's and Medmarc's cross-motions for summary judgment on Medmarc's duty to indemnify Angeion for the $1.4 million paid in settlement of ELA's cross-claim.  Angeion also moves for a determination of the amount of reasonable defense costs and fees incurred from the time ELA filed its cross-claim.  ELA moves for dismissal of all claims between Medmarc and ELA, entry of

final judgment on such dismissal and entry of final judgment against Angeion.

## DISCUSSION

### I.    Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the non-moving party. See id. at 255.  The non-moving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth

6

specific facts sufficient to raise a genuine issue for trial.  See Celotex, 477 U.S. at 324.  Judgment may be rendered with respect to all or any part of a particular claim.  See Fed. R. Civ. P. 56(b). The question of whether an insurer has a duty to indemnify is a question of law that the court may properly decide on summary judgment.  See Thommes v. Milwaukee Ins. Co., 641 N.W.2d 877, 879 (Minn. 2002).

## II.  Nature of Settlement

As an initial matter, the parties disagree as to whether Miller v. Shugart or Butler Bros. v. American Fidelity Co. governs the review of the settlement between Angeion and ELA.  See Miller, 316 N.W.2d 729 (Minn. 1982); Butler, 139 N.W. 355 (Minn. 1913).  In a Miller-Shugart settlement, the insurer denies all coverage, and the abandoned insured agrees with the claimants that judgment may be entered against it in return for claimants releasing the insured from personal liability.  Peterson v. Wilson Township, 672 N.W.2d 556, 558 n. 1 (Minn. 2003).  The purpose of a Miller-Shugart agreement is to relieve the insured of liability and allow the claimant to bring an action directly against the insurer.  See Chalmers v. Kanawyer, 544 N.W.2d 795, 795 & n.1 (Minn. Ct. App. 1996).  By contrast, in a Butler settlement, the abandoned insured typically faces direct legal action from the claimants, settles with the claimants and remains fully liable for the settlement amount.  See Butler, 139 N.W. at 360; see also Miller, 316 N.W.2d

at 735 (distinguishing <u>Butler</u> settlement as being entered into "in the course of a real trial" (internal quotes omitted)).

Here, Medmarc refused to defend Angeion, who faced cross-claims brought by ELA and the threat of expensive arbitration proceedings.  When Angeion settled with ELA, it remained fully liable for the settlement amount and continued to seek indemnification from Medmarc.[2]  For these reasons, the court finds that the nature of the settlement between Angeion and ELA falls squarely within the definition of a <u>Butler</u> settlement.

## III. Duty to Indemnify

### A.   Policy Coverage

Angeion asserts that Medmarc has a duty to indemnify Angeion for the full amount of its settlement with ELA.  In determining an insurer's liability for the amount of a <u>Butler</u> settlement, the court must first ascertain whether the policy covers the matter settled.[3]   <u>See, e.g.,</u> <u>Engeldinger v. State Auto. & Cas.</u>

---

[2]   Angeion and ELA discussed a classic <u>Miller-Shugart</u> settlement where ELA would release Angeion from liability and seek recovery from Medmarc directly.  However, ELA declined such a settlement because it perceived too many uncertainties.

[3]  Angeion argues that the court does not engage in a standard coverage analysis for <u>Butler</u> settlement indemnity.  It is true that to avoid a duty to indemnify, the insurer has the burden to show that there would have been no recovery in the action had it not been settled.  <u>See</u> <u>Butler</u>, 139 N.W. at 360.  However, that showing of non-recovery concerns only the insured's liability to the third party claimant.  <u>See</u> <u>id.</u>  The court must first address whether the insurance policy covers the matter settled.  <u>See</u> <u>id.</u> (finding that the insured "proved that the accident was within the terms of the
(continued...)

Underwriters, 236 N.W.2d 596, 598, 601 (Minn. 1975) (considering "main issue" of coverage before determining insurer's liability for amount of Butler settlement). The court applies general contract principles to interpret an insurance policy, giving effect to the intent of the parties. Nathe Bros., Inc. v. Am. Nat'l Fire Ins. Co., 615 N.W.2d 341, 344 (Minn. 2000). Unambiguous and undefined language in an insurance policy is given its plain and ordinary meaning. Jenoff, Inc. v. N.H. Ins. Co., 588 N.W.2d 260, 262 (Minn. 1997). If ambiguous, policy language is construed against the drafter. See Progressive Specialty Ins. Co. v. Widness ex rel. Widness, 635 N.W.2d 516, 518 (Minn. 2001). "An ambiguity exists when a word or phrase in an insurance policy is reasonably subject to more than one interpretation." Minn. Prop. Ins. v. Slater, 673 N.W.2d 194, 199 (Minn. Ct. App. 2004). Finally, exclusions contained in an insurance policy are construed strictly against the insurer in light of the expectations of the insured. Thommes, 641 N.W.2d at 880.

Medmarc repeats many of the same policy interpretation arguments that it previously raised regarding its duty to defend Angeion. To determine whether Medmarc had a duty to defend

_____

(...continued)
policy"). Indeed, the coverage issue is paramount. See Engeldinger v. State Auto. & Cas. Underwriters, 236 N.W.2d 596, 598 (Minn. 1975) (case involved Butler settlement, and coverage was "main issue"); Klemmer v. Ohio Cas. Ins. Co., 246 N.W. 896, 898 (Minn. 1933) (case involved Butler settlement, and coverage was the important issue).

Angeion, the court needed only find that ELA's claim was "arguably" covered under the policy.  See Home Ins. Co. v. Nat'l Union Fire Ins. of Pittsburgh, 658 N.W.2d 529 (Minn. 2003).  However, the court rejected most of Medmarc's defenses to coverage based on a straightforward interpretation of the policy language. (See Order, Aug. 25, 2005.)  The court will not repeat its interpretation here. Rather, it will only address new arguments by Medmarc and those coverage issues not fully resolved in the court's previous order.

### 1.  Defenses to Coverage

First, Medmarc argues that ELA's cross-claim against Angeion did not constitute a "suit" as required under the policy because the cross-claim was allegedly manufactured and agreed upon by Angeion and ELA.   The policy defines a "suit" as "a civil proceeding in which damages because of 'bodily injury' or 'property damage' to which this insurance applies are alleged." (Policy at 11.) A "suit" includes an arbitration proceeding. (Id.) Contrary to Medmarc's argument, the definition of "suit" does not depend upon whether the parties agree to resolve their dispute in a particular forum.   Moreover, there is no indication that the parties "manufactured" a suit to fall within the policy's terms because the alternative forum of arbitration would also have constituted a "suit."   For these reasons, Medmarc's argument is without merit.  The court finds that Angeion and ELA's agreement to

attempt to resolve ELA's claims in the forum chosen by Medmarc falls within the meaning of the term "suit."

Second, Medmarc argues that Angeion does not have a "legal obligation to pay damages" as required under the policy because it merely outsourced its responsibilities through earlier contracts with ELA.   The court disagrees.   "[A] contract is a legally enforceable promise."   Cedarstrand v. Lutheran Bhd., 117 N.W.2d 213, 219 (Minn. 1962).   Angeion's contractual liabilities resulted in legal obligations to pay damages and are therefore covered by the policy.   To the extent that Medmarc repeats its argument that the "contractual liability" exclusion precludes coverage, the court has already concluded that the exception to that exclusion applies in this case.   (See Order at 12-14, Aug. 25, 2005.)

### 2.   Policy Exclusions

Medmarc also argues that two policy exclusions prevent coverage of ELA's cross-claim.   As the insurer, Medmarc bears the burden of proving the applicability of a policy exclusion.   See Domtar, Inc. v. Niagara Fire Ins. Co., 563 N.W.2d 724, 736 (Minn. 1997).   If successful, the burden shifts to Angeion to show that an exception to the exclusion applies.   See id. at 736.   Medmarc first contends that coverage is barred by the policy's "your product" exclusion.   The "your product" exclusion provides that "insurance does not apply to ... '[p]roperty damage' to 'your product' arising out of it or any part of it."   (Policy at 2.)   In effect, the

exclusion limits the policy's coverage of certain property damage. However, the policy extends coverage to damages as a result of "'bodily injury' *or* 'property damage.'" (Id. at 1 (emphasis added).) In its August 25 order, the court found that ELA's claims qualified as "bodily injury." (See Order at 9-10, Aug. 25, 2005.) Therefore, the "your product" exclusion does not preclude coverage of ELA's claims against Angeion.

Medmarc also argues that coverage of ELA's claim is barred by the policy's "sistership" exclusion.[4] The "sistership" exclusion precludes coverage for losses incurred from product recall based on "a known or suspected defect, deficiency, inadequacy or dangerous condition in it." (Policy at 3.) However, products that are withdrawn or recalled after they actually fail while in use are not covered by such an exclusion. Atl. Mut. Ins. Co. v. Judd Co., 380 N.W.2d 122, 125-26 (Minn. 1986); see also Bright Wood Corp. v. Bankers Standard Ins. Co., 665 N.W.2d 544, 549 (Minn. Ct. App. 2003) (sistership exclusion applies when it is not possible to identify which components of withdrawn product would fail). A product "fails in use" if testing on that product indicates it will

---

[4] The court addressed the "sistership" exclusion in its prior order, but did not determine whether or to what extent it precluded coverage. (See Order at 12, Aug. 25, 2005.) Rather, the court found that at least some of ELA's claims fall under the exception to the exclusion, which sufficed to establish Medmarc's duty to defend Angeion. (See id.) Therefore, it is appropriate for the court to revisit the "sistership" exclusion on the issue of Medmarc's duty to indemnify Angeion.

not perform its required function.  See Atlantic Mutual, 380 N.W.2d at 123, 126 (pipes "failed in use" when testing showed they would not withstand required pressure).

The undisputed evidence shows that ninety-two of the 160 explanted ICDs met the specified voltage level to warrant recall. Because those ICDs failed to maintain the necessary voltage, they failed while in use and are not subject to the sistership exclusion.  Of the remaining sixty-eight explanted ICDs, thirty-six do not have a documented voltage level, although Medmarc does not dispute that the ICDs were tested before explantation.  Without voltage testing results or some other indication of the ICDs' function, there is no evidence that those thirty-six ICDs did not fail while in use or otherwise fall within the sistership exclusion.  Therefore, Medmarc has failed to meet its burden to show that the exclusion applies to those thirty-six ICDs.

By contrast, the remaining thirty-two explanted ICDs had a documented voltage level that did not meet the specified level to warrant recall.  Such evidence satisfies Medmarc's burden to show that the recalled ICDs did not fail while in use and are therefore precluded from coverage by the sistership exclusion.  In response, Angeion argues that an exception to the sistership exclusion applies.  In an endorsement, Medmarc agreed that the policy's sistership exclusion:

> does not apply to the cost of reasonable and
> necessary medical expenses incurred by persons

13

> attributable to the withdrawal of [Angeion's products], including physical examinations and surgical expenses, made necessary by reason that the use or consumption of such products shall result in bodily injury, sickness, disease or death of any person ... caused by an occurrence.

(Endorsement 234 11 96G.)  Angeion's claim for indemnification involves costs incurred by ELA as a result of the defect in Angeion's ICDs that created a risk of death and necessitated the withdrawal of those ICDs.  The court has already found that at least a portion of ELA's damages fall under the sistership exception as medical expenses it incurred in carrying out the withdrawal of ICDs.[5]  (See Order at 12, Aug. 25, 2005.)  Angeion alleges that all damages sought by ELA constituted "necessary medical expenses" because they related to doctor and clinic costs, replacement ICDs and attendance of ELA's medical staff.  (See Angeion's Reply Supp. Mot. Summ. J. at 8; Jahnke Aff. Opp'n Pl.'s Mot. Summ. J. ¶ 11.)

In arguing that the exception does not apply, Medmarc points to the different categories of expenses sought by ELA and alleges that only ELA's "hospital costs" constitute medical expenses, whereas ELA's "device costs" and "own expenses" do not.  (See Jahnke Aff. Opp'n Pl.'s Mot. Summ. J. Ex. A.)  The court agrees. Testimony by Brian Sheridan, Vice President for Corporate Legal

---

[5]  The court has already considered and rejected Medmarc's other arguments concerning the inapplicability of the sistership exception.  (See Order at 9-12, Aug. 25, 2005.)

14

Affairs for the parent company of ELA, indicates that "device costs" include the cost of replacement ICDs and ELA's "own expenses" include the cost of ELA representatives visiting the patient and hospital, explaining the consequences of the ICD withdrawal and similar costs.  (See Sheridan Dep. at 274-79.)  The court finds that the plain meaning of "reasonable and necessary medical expenses" does not include replacement ICDs and visits by ELA representatives.  The court's finding is supported by the language in the exception that identifies "physical examinations and surgical expenses" as examples of medical expenses. (Endorsement 234 11 96G.)  Moreover, Sheridan agreed that ELA's "device costs" and "own expenses" did not include medical expenses. (See id. at 279.)  Angeion has failed to point to evidence to the contrary.  Therefore, as to the thirty-two ICDs that fall under the sistership exclusion, the court finds that the exception applies only to ELA's "hospital costs."

For all of the above reasons, the court finds that Medmarc's policy provides coverage for the matters settled between Angeion and ELA, except to the extent that the settlement included ELA's "device costs" and "own expenses" for the thirty-two explanted ICDs that did not meet the specified voltage levels to warrant recall.

**B.   Reasonableness of the Settlement**

Medmarc contends that even if its policy provides coverage, it is not liable for the settlement amount because the settlement was

unreasonable, collusive and not based on evidence that Angeion was liable to ELA in the amount settled.  A <u>Butler</u> settlement made in good faith "is prima facie evidence of liability and the amount thereof." <u>Mendota Elec. Co. v. N.Y. Indem. Co.</u>, 211 N.W. 317, 318 (Minn. 1926).  The presumption of liability is that of the insured to the claimant.  <u>See</u> <u>Butler</u>, 139 N.W. at 360.  To overcome the presumption, the insurer has the burden of proof to show that the claimant could not have recovered from the insured if the action had proceeded.  <u>Id.</u>

Although Medmarc has raised a number of arguments regarding the merits of ELA's claim against Angeion, it has failed to show that ELA would not have recovered from Angeion if the matter had not been settled.  Further, the evidence does not indicate any unreasonableness or collusiveness on the part of Angeion or ELA. Rather, the two parties legitimately considered the costs of litigation and potential arbitration, disputed the merits of ELA's claims, and exchanged numerous settlement offers before agreeing to judgment in the amount of $1.4 million.  The settlement amount is reasonable in light of ELA's claim of $1.7 million, threat to pursue cost-intensive arbitration and likely entitlement to prejudgment interest, attorney's fees and costs.  Angeion's attempt to resolve the dispute with ELA in the most cost-effective manner is particularly understandable because Medmarc breached its duty to defend Angeion.  For all of these reasons, the court finds that the

16

settlement between Angeion and ELA was reasonable, non-collusive and made in good faith.

Therefore, Medmarc has a duty to indemnify Angeion for the amount of settlement with ELA that corresponds to claims covered by Medmarc's policy.  The parties have not pointed to sufficient evidence of the amount of the non-covered claims or the extent to which the settlement included those claims.  The court declines to speculate.  Therefore, a specific determination as to the percentage or amount of the settlement that Angeion is entitled to recover from Medmarc is not warranted at this time.

## IV. Determination of Defense Fees

Angeion seeks recovery of defense fees in the amount of $49,353.10 from Medmarc.[6]  An insured may recover the reasonable value of defense costs when the insurer breaches its duty to defend.  See In re Silicone Implant Ins. Coverage Litig., 677 N.W.2d 405, 422 (Minn. 2003).  Defense costs include attorney's fees and consultant costs that are "reasonably necessary either to defeat liability or to minimize the scope or magnitude of such liability." Domtar, Inc. v. Niagara Fire Ins. Co., 563 N.W.2d 724, 738 (Minn. 1997) (en banc) (emphasis omitted).  The insured is also

---

[6]  Angeion's requested amount is based upon total costs and fees amounting to $102,878.15, less a $50,000 self-insured retention amount and less $4,285.05 already paid by Medmarc.

entitled to prejudgment interest on the amount of defense fees awarded. See Seaway Port Auth. of Duluth v. Midland Ins. Co., 430 N.W.2d 242, 252 (Minn. Ct. App. 1988).

Angeion has submitted a detailed affidavit and corresponding exhibits to support its request for reasonable defense fees and interest. Angeion's defense fees include attorney's fees, consultant fees and costs incurred in obtaining a letter of credit to secure payment of the promissory note as part of the settlement with ELA. The consultant fees resulted from Angeion's retention of its former President and CEO Richard E. Jahnke to assist in the litigation. Based on the evidence provided by Angeion, the court finds that the defense fees requested are reasonable and recoverable.

Medmarc asserts that the court should only partially grant Angeion's request for fees for two reasons. First, Medmarc argues that the insurance policy requires that the request be offset by the difference in hourly rates between its attorneys and Angeion's attorneys. However, the cited policy provision does not apply here. The provision applies only when Medmarc defends a suit in which Angeion is entitled by law to select its own counsel. (See Policy at 4.) Medmarc breached its duty to defend and is not entitled to the protection of the provisions it breached. Further, there is no evidence that the attorney's fees Angeion requests are otherwise unreasonable.

18

Second, Medmarc argues that Angeion's request for consultant fees should be denied because the policy does not provide for such fees. Again, the relevant provisions do not apply because Medmarc breached its duty to defend Angeion. In addition, Medmarc has made no showing that the consultant fees were not reasonably necessary to minimize the scope or magnitude of Angeion's liability. Rather, Medmarc's lengthy deposition of Jahnke demonstrates his important role in Angeion's defense. For all of the above reasons, Medmarc's objections to Angeion's request for defense fees are without merit. An award of Angeion's defense fees in the amount of $49,353.10 is warranted.

## V.   Dismissal of Claims Between Medmarc and ELA

ELA asserts that the claims between it and Medmarc must be dismissed because the court lacks subject matter jurisdiction over those claims. See Fed. R. Civ. P. 12(b)(1). To meet jurisdictional requirements, an action filed under the Declaratory Judgment Act must present an "actual controversy" that is ripe for decision. See 28 U.S.C. § 2201; Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 506 (1972). An actual controversy exists if the parties have adverse legal interests that are "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Lake Carriers' Ass'n, 406 U.S. at 506 (citation omitted). A live controversy must exist throughout the litigation and not only when the action is filed. Marine Equip. Mgmt. Co. v.

United States, 4 F.3d 643, 646 (8th Cir. 1993).  To determine whether a controversy is live, the court looks to the facts on a case by case basis.  Id.

In this case, Medmarc seeks a declaratory judgment that its policy does not provide coverage for defendants' claims.  (See Compl. at 2, 4.)  In its counterclaim against Medmarc, ELA seeks damages and a declaratory judgment that it is entitled to coverage and indemnification from Medmarc.  (See Crosscl. at 11.)  However, ELA has now settled its underlying claim in full and no longer has an interest in the coverage and indemnification dispute that remains between Angeion and Medmarc.  For that reason, the court finds that it lacks jurisdiction over the claims between ELA and Medmarc because no actual controversy remains between the parties.

Medmarc argues that ELA remains a necessary party because if the court finds that the settlement between ELA and Angeion was collusive, the resulting judgment must be undone and ELA's cross-claim against Angeion must be reinstated.  (See Pl.'s Mem. Resp. ELA's Summ. J. Mot. at 2.)  However, the court has found that the settlement did not involve collusion.  Moreover, such reinstatement of claims occurs only when a Miller-Shugart settlement is found to be unreasonable.  See Alton M. Johnson Co. v. M.A.I. Co., 463 N.W.2d 277, 280 (Minn. 1990) (unreasonable Miller-Shugart settlements are unenforceable because such settlements are not made at arms' length).  For these reasons, Medmarc's argument is without

merit.   Therefore, dismissal of Medmarc's claims against ELA and ELA's counter-claims against Medmarc is warranted.  The court finds that there is no just reason for delay in entering final judgment on the dismissal and on the judgment entered in favor of ELA and against Angeion.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1.   ELA's motion to dismiss and for entry of final partial judgment [Doc. No. 159] is granted.  Medmarc's claims against ELA and ELA's counterclaim against Medmarc are hereby dismissed for lack of subject matter jurisdiction.   It is hereby ordered, adjudged and decreed that:

    a.   Final judgment on the dismissal of Medmarc's claims against ELA and ELA's counterclaim against Medmarc shall be entered pursuant to Fed. R. Civ. P. 54(b) as there is no just reason for delay.

    b.   Final judgment on the judgment entered in favor of ELA and against Angeion [Doc. No. 91] shall be entered pursuant to Fed. R. Civ. P. 54(b) as there is no just reason for delay.

2.   Angeion's motion for summary judgment and for determination of defense fees [Doc. No. 164] is granted in part. It is hereby ordered, adjudged and decreed that:

a.  Angeion is entitled to recover from Medmarc the $1.4 million Angeion paid to settle the claim of ELA arising out of the recall of Angeion's ICDs, plus interest from June 30, 2005, except to the extent that the settlement included ELA's "device costs" and "own expenses" for the thirty-two explanted ICDs that did not meet specified voltage levels to warrant recall.

b.  In defending ELA's claim after ELA formally filed its cross-claim in this action, Angeion is entitled to recover from Medmarc reasonable costs and fees in the amount of $49,353.10.  This amount takes into account the amount of $4,285.05 already paid by Medmarc.

3.  Medmarc's motion for summary judgment [Doc. No. 197] is granted in part.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  February 17, 2006

s/David S. Doty
David S. Doty, Judge
United States District Court